In re WESTERN ASBESTOS COMPANY, Western MacArthur Company, and Mac Arthur Company, Debtors.

Nos. 02–46284 T to 02–46286 T.

United States Bankruptcy Court, N.D. California.

Oct. 31, 2003.

---

Alan Pedlar, Charles D. Axelrod, Stutman, Treister & Glatt, Los Angeles, CA, for Debtor.

Margaret Sheneman, Murphy, Sheneman, Julian and Rogers, San Francisco, CA, Michael H. Aherns, Sheppard, Mullin, Richter and Hampton, San Francisco, CA,

Peter Van N. Lockwood, Caplin, Drysdale and Chartered, Washington, DC, for Official Committee of Unsecured Creditors.

## MEMORANDUM OF DECISION RE CONFIRMATION LEGAL ISSUES

LESLIE TCHAIKOVSKY, Bankruptcy Judge.

The above-captioned chapter 11 cases are set for an evidentiary hearing on confirmation of a reorganization plan (the "Plan") beginning on November 10, 2003. To expedite the conduct of the hearing, the Court set a briefing schedule for legal issues relating to confirmation. After these issues were briefed, the Court issued a Tentative Decision in which it made tentative rulings on some of the issues, tentatively deferring its rulings on the remaining issues until the confirmation hearing.

After the Tentative Decision was issued, on October 29, 2003, a hearing on the legal issues was conducted at which counsel for all parties appeared and were heard.[1] The Court issues this Memorandum of Decision after further consideration of the issues in light of oral argument. In it, the Court again makes rulings on some of the issues and defers the remaining issues for decision at or after the confirmation hearing. However, as indicated below, the Court's rulings and deferrals have been modified somewhat from those stated in the Tentative Decision.

## DISCUSSION

### A. BACKGROUND

The Plan is being jointly proposed by the three chapter 11 debtors (the "Debtors"), the Official Creditors' Committee (the "Committee"), and the Hon. Charles Renfrew (the "Futures Representative").[2] The Debtors are: (1) MacArthur Co. ("MacArthur"), a distributor and installer of building materials and the parent of Western MacArthur Co. ("Western MacArthur"), (2) Western MacArthur, also a distributor and installer of building materials, and (3) Western Asbestos Company ("Western Asbestos"), a defunct company whose assets were acquired by Western MacArthur after it had been operated by MacArthur for two years.[3] The members of the Committee are all asbestos claimants (or their attorneys).

1. At the October 29 hearing, the Plan Proponents agreed to make certain changes to the Plan to address some of the Court's tentative rulings. With the understanding that these changes will be made, for the most part, the Court has eliminated any discussion of the issues in question and in any event has eliminated any ruling on the issues.

2. The Futures Representative was appointed by the bankruptcy court to represent the holders of "future demands": i.e., the right to payment by individuals who have been exposed to asbestos but are not yet aware that they have suffered an injury. The Ninth Circuit, as well as other circuits, has held that, as a constitutional matter, future demands may not be discharged in bankruptcy unless the holders of such demands had some basis for knowing that they had a right to payment in time to file proofs of claim in the bankruptcy

case. *See In re Jensen,* 995 F.2d 925 (9th Cir.1993). At the October 29 hearing, the Court was advised that the Debtors contend that future demands qualify as "claims" for purposes of the best interests test under 11 U.S.C. § 1129(a)(7) and that the Objecting Insurers dispute this contention. The issue will be reserved for confirmation.

3. In state court litigation, Western MacArthur was held to be the successor of Western Asbestos, the defunct company, for liability purposes by virtue of its acquisition of Western Asbestos's assets. The bulk of the asbestos related claims arise from the operations of Western Asbestos. A substantially smaller number of claims arise from the MacArthur's operations in other states, mostly in the Midwest, and from Western MacArthur's own California operations.

The Debtors were in coverage litigation with USF & G for approximately 10 years before reaching the settlement embodied by the Plan.[4] The settlement is conditioned on confirmation of the Plan. A committee of asbestos claimants, virtually identical in its composition to the Committee, and the Futures Representative participated in the negotiations. During the coverage litigation, before it was settled, the Debtors entered into agreements with many of the asbestos claimants. These agreements permitted the claimants either to seek default judgments (which the Debtors agreed not to oppose) (the "California default judgment claims") or provided them with stipulated judgments pursuant to Minnesota law in amounts set by a matrix consistent with other settlements of like claims in Minnesota. In return, the claimants agreed not to attempt to enforce their claims against the Debtors unless the Debtors filed bankruptcy petitions.

After the settlement and before the bankruptcy petitions were filed, additional asbestos claimants were permitted to liquidate their claims in accordance with the matrix proposed under the Plan (the "Matrix"). One other group of claimants has been permitted to liquidate their claims in accordance with the Matrix during the chapter 11 case. In addition, the Debtors entered into a settlement with a third group of claimants (the "Constructive Trust claimants"), which the Court approved, providing them with payment of a compromised amount directly by USF & G from funds that would otherwise have been available to fund the Plan.

As a result of these post-petition settlements, at this point, the only parties objecting to confirmation are four insurance companies: i.e., Hartford Accident and Indemnity Company ("Hartford"), Argonaut Insurance Company ("Argonaut"), General Accident Insurance Company of America ("General Accident"), and U.S. Fire Company ("U.S. Fire") (the "Objecting Insurers"), two of which (Hartford and Argonaut) are still in coverage litigation with the Debtors and two of which (U.S. Fire and General Accident) have been sued by Hartford in coverage litigation.[5] Hartford is taking the lead in opposing confirmation.

The Plan divides creditors into four classes and interest holders into three classes. The Bankruptcy Code requires classes of claims and interests to be designated as "impaired" or "unimpaired."

Impairment means any alteration of a claimant's or interest holder's legal or equitable rights. 11 U.S.C. § 1124. Only impaired classes are entitled to vote on a plan. 11 U.S.C. § 1126(f). However, other parties in interest may object to the Plan on legal grounds. The only impaired classes in the Plan are Class 4 (the asbestos related claims) and Classes 5B and 5C (the equity interests in Western Asbestos and MacArthur Company, respectively). Administrative claims (i.e., claims incurred after the bankruptcy case was filed) and pre-petition priority tax claims are not classified. The Bankruptcy Code specifies how they must be treated. The Plan complies with the Bankruptcy Code in its proposed treatment of these two categories of unclassified claims.

The Plan provides for the establishment of a trust (the "Trust") which will process and pay the Class 4 claims to the extent possible from the funds contributed by USF & G and other possible sources of

---

4. USF & G issued insurance policies only to Western Asbestos, which Western Marathon contends were assigned to it.

5. Argonaut issued six insurance policies to Western Asbestos and three insurance policies to Western Marathon. Harbor and U.S. Fire insured Marathon and Western Marathon.

recovery: e.g., hoped for recoveries from the Objecting Insurers. The way in which the Plan will do this is set forth in another document, entitled Trust Distribution Procedures (the "TDP"). (The TDP is attached as Exhibit 2, Annex B, to the Plan.)

As discussed below, 11 U.S.C. § 524(g) requires the Trust to pay claims in such a way that present claims and future demands will receive equivalent payment percentages. At present, it is anticipated that asbestos claimants will receive an initial distribution of approximately 11.5% of their claims. Whether there will be any additional distributions depends largely on whether the Trust is able to recover any funds from the Objecting Insurers.

Claims that have already been liquidated will be paid approximately 11.5% shortly after confirmation. Some claimants received payments on their claims pre-petition and will only receive an amount sufficient post-confirmation to bring the total up to 11.5%. Holders of claims that have not been liquidated and future demands will have three choices: (1) they may have their claims liquidated in accordance with the Matrix; (2) they may submit to binding or nonbinding arbitration; and (3) if they submit to nonbinding arbitration and do not like the result, they may seek a judgment in court. Holders of unliquidated claims will not be entitled to receive the initial 11.5% distribution (or any additional distributions) until their claims are liquidated. There will be three trustees overseeing the Trust and a Trust Advisory Committee. The Committee and the Futures Representative will select these individuals.

The Debtors' settlement agreement with USF & G is attached as Exhibit 3 to the Plan. It provides that USF & G will pay a total of $975 million in full settlement of its liability for the asbestos claims, including future demands.[6] Of this amount: $110 million was paid prior to the petition date on account of claims that have already been reduced to judgment; $740 million (or $737 million) has been paid into the "Claimant Escrow," which will fund the asbestos trust upon the effective date of the Plan; $40 million has been paid into the "Expense and Fee Escrow," of which $30 million was disbursed prior to the petition date to pay Debtors' counsel for their fees incurred in the coverage litigation and related settlement with USF & G; and $35 million has been paid into the "Administrative Fund Escrow" for miscellaneous fees and expenses, including costs and fees associated with litigation, with any remainder to be transferred to the Trust on the effective date of the Plan. In addition, the Trust will receive: (1) all of the stock of Western Asbestos, the defunct corporation, (2) a $500,000 promissory note executed by MacArthur secured by 51% of its stock, payable over 5 years, and (3) the benefit of all of the Debtors' rights (as well as any direct action rights of the asbestos claimants) against the Objecting Insurers with the exception of $1.0 million out of the first $5.0 million in recoveries on account of bad faith business loss claims.

Confirmation will "channel" all the asbestos claims to the Trust and will discharge two of the Debtors from those claims.[7] In addition, if the Plan is confirmed, the Court will issue an injunction under 11 U.S.C. § 524(g), protecting USF

---

6. This sum has presumably been reduced by $3 million by virtue of the settlement with the Constructive Trust claimants, as discussed below. The Court assumes that this reduction will be passed along solely to the Claimant Escrow, which is discussed below.

7. As discussed below, the Court concludes that Western Asbestos is not entitled to a discharge.

& G and others from the "channeled" claims as well as from any claims for contribution or indemnification by the Objecting Insurers.

One of the most controversial provision of the Plan was the Debtors' request that the Court "adjudicate" the total amount of the asbestos related claims against the Debtors. As discussed below, based on the Court's tentative ruling that it could not "adjudicate" the total claims and demands against the Debtors, this request has been withdrawn.

## B. ISSUES

To confirm the Plan, the Court must find that the requirements of both 11 U.S.C. § 524(g) and § 1129 have been satisfied.[8] These requirements are discussed in sections 1 and 2, respectively. As noted above, the Plan proposes the issuance of certain injunctions. Section 3 discusses issues related to these injunctions. In addition, as also noted above, the Plan proposes to assign to the Trust certain rights under the insurance policies issued by the Objecting Insurers (the "Policies"). Issues related to the Policies and their proposed assignment to the Trust are discussed in section 4. The Court considers the issues raised by the parties pursuant to FRCP 56, which is made applicable to this proceeding by FRBP 7056.[9]

## 1. SECTION 1129 REQUIREMENTS

Section 1129(a) provides that:

8. The requirements of 11 U.S.C. § 1129 apply to all chapter 11 plans. The requirements of 11 U.S.C. § 524(g) apply only to plans dealing with asbestos related claims.

9. Rule 56 directs the court to grant judgment in accordance with the relevant law when there are no genuine issues of material fact. In doing so, the court must view the evidence in the light most favorable to the nonmoving party. *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir.2001). When some but

The court shall confirm a plan only if all of the following requirements are met:

(1) The plan complies with the applicable provisions of. . . [the Bankruptcy Code].

(2) The proponent of the plan complies with the applicable provisions of. . . [the Bankruptcy Code].

(3) The plan has been proposed in good faith and not by any means forbidden by law.

(4) Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services of or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

(5) (A)(i)The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

(ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

not all issues may be decided in this fashion, if practicable, the court is directed to determine and to make an order specifying "what material facts exist without substantial controversy and what material facts are actually and in good faith controverted." "Upon the trial of the action the facts so specified shall be deemed established." FRCP 56(d). This grant of partial summary judgment is intended to be interlocutory in nature.

(B)the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

(6) Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

(7) With respect to each impaired class of claims or interests—

(A) each holder of a claim or interest—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7... [of the Bankruptcy Code] on such date; or

(B) if section 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

(8) With respect to each class of claims or interests—

(A) such class has accepted the plan; or

(B) such class is not impaired under the plan.

(9) Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that—

(A) with respect to a claim of a kind specified in section 507(a)(1) or 507(a)(2) of... [the Bankruptcy Code], on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(B) with respect to a class of claims of a kind specified in section 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of... [the Bankruptcy Code], each holder of a claim of such class will receive—

(i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

(C) with respect to a claim of a kind specified in section 507(a)(8) of... [the Bankruptcy Code], the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

(10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the

plan, unless such liquidation or reorganization is proposed in the plan.

(12) All fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

(13) Section 1129(a)(13) requires the court to find that: "[t]he plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of... [the Bankruptcy Code], at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of... [the Bankruptcy Code], at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits."

The Objecting Insurers have not raised any issues regarding the Plan's compliance with 11 U.S.C. § 1129(a)(2), (5), (6), or (8)-(13), and the Court finds that the Plan complies with these subsections. Thus, the Court will only discuss below the is-

sues raised by 11 U.S.C. § 1129(a)(1), (3), (4) and (7).[10]

### a. Section 1129(a)(1)

As recited above, 11 U.S.C. § 1129(a)(1) requires the Court to determine that the Plan complies with the applicable provisions of the Bankruptcy Code. The apparent simplicity of this provision is deceptive. As the Plan Proponents acknowledge, this provision requires the Court to find that the Plan complies with the following provisions: (1) 11 U.S.C. § 1122(a), which describes how claims may be classified in a plan, (2) 11 U.S.C. § 1123(a), which specifies those provisions a plan *must* contain, and (3) 11 U.S.C. § 1123(b), which specifies those provisions a plan *may* contain.

Section 1122(a) provides as follows:

...a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

Section 1123(a) provides that a chapter 11 plan *shall:*

(1) designate classes of claims, other than claims entitled to priority under sections 507(a)(1), 507(a)(2), or 507(a)(8),[11] and classes of interests;

---

**10.** The Objecting Insurers contend that the Plan Proponents improperly solicited the votes of certain groups of asbestos claimants. If a sufficient number of votes are invalidated based on their having been improperly solicited, Class 4 may not have effectively accepted the Plan as required by 11 U.S.C. § 1129(a)(8). *See* 11 U.S.C. § 1126(c) (specifying the number and dollar amounts of claims voting in favor of a plan required to constitute acceptance by an impaired class for purposes of confirmation) and § 524(g)(2)(B)(ii)(IV)(b) (specifying the number of asbestos related claims voting in favor of a plan required for the issuance of an injunction under 11 U.S.C. § 524(g)). However, the Objecting Insurers raise this objection in the context of 11 U.S.C. § 1129(a)(3);

therefore, the objection will be discussed in that context.

**11.** Claims entitled to priority under 11 U.S.C. § 507(a)(1) (administrative claims), 507(a)(2) (claims that arise after an involuntary petition is filed and before the order for relief is entered), and 507(a)(8) (claims for spousal support) are not classified because their rights may not be impaired. The Bankruptcy Code specifies how they must be treated in a plan unless the holder of the claim affirmatively agrees to a less favorable treatment. There are no spousal support or involuntary "gap" claims in this case. The Plan provides a treatment for administrative claims that complies with the Bankruptcy Code.

(2) specify any class of claims or interests that is not impaired under the plan;

(3) specify the treatment of any class of claims or interests that is impaired under the plan;

(4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment for its claim or interest;

(5) provide adequate means for the plan's implementation;

(6) provide for the inclusion in the charter of any corporate debtor (or of any corporation to whom property of the estate is to be transferred or with which the debtor will merge pursuant to the plan); and

(7) contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee.

Section 1123(b) provides that a chapter 11 plan *may* do the following things:

(1) It may impair or leave unimpaired any class of claims or interests.

(2) It may provide for assumption, rejection, or assignment of executory contracts or unexpired leases.

(3) It may provide for the settlement or adjustment of any claim or interest of the debtor or the estate or may provide for the retention and post-confirmation enforcement of the claim or interest by the debtor, the trustee, or by a representative of the estate appointed for that purpose.

(4) It may provide for the sale of all or substantially all of the property of the estate and the distribution of the sale proceeds among holders of claims or interests.

(5) It may modify the rights of unsecured creditors and of secured creditors (with the exception of a secured creditor whose only collateral is the debtor's principal residence) or may leave those rights unmodified.

(6) It may include any other appropriate provisions not inconsistent with the applicable provisions of this title.

The Objecting Insurers have not raised any issues regarding the Plan's compliance with 11 U.S.C. § 1122(a),[12] 11 U.S.C. § 1123(a)(1)-(3) or (5)-(7), or 11 U.S.C. § 1123(b)(1)-(5). The Court finds that the Plan satisfies those provisions. In addition, to that extent, the Court also finds that the Plan satisfies 11 U.S.C. § 1129(a)(1). Therefore, the Court will only discuss whether the Plan satisfies 11 U.S.C. § 1123(a)(4) and 11 U.S.C. § 1123(b)(6).

**(1) Section 1123(a)(4)**

As recited above, 11 U.S.C. § 1123(a)(4) requires a plan to treat all members of a class in the same manner. The Objecting Insurers contend that the Plan violates this provision because it proposes to treat the Class 4 liquidated claims more favorably than the Class 4 unliquidated claims. They note that all of the holders of liquidated claims will receive payment much sooner than the holders of unliquidated

---

12. To the extent that the Objecting Insurers contend that Class 4 is improper because it includes both liquidated and unliquidated claims, the Court overrules this objection to the Plan. Liquidated and unliquidated general, unsecured claims are clearly "substantially similar" within the meaning of 11 U.S.C. § 1122(a) and are routinely placed in the same class in chapter 11 plans.

claims. In addition, particular groups of claims are receiving or have already received additional types of preferential treatment.[13]

The Objecting Insurers comment first on the preferential treatment being given to the California default judgment claims. They note that the average amounts of these claims are substantially higher than the amounts set forth in the Matrix (which are based on average settlement amounts). The Matrix has been used to liquidate most of the other liquidated claims (other than those claims liquidated by Miller–Shugart settlements prior to the petition date) and will be used to liquidate unliquidated claims under the TDP.[14] In addition, they note, the holders of the California default judgment claims received a partial payment before the bankruptcy cases were filed. According to the Objecting Insurers, these claimants are also receiving additional compensation because the Debtors do not propose to file actions to avoid these prepetition payments as fraudulent transfers.

The second group of Class 4 claimants identified by the Objecting Insurers as receiving preferential treatment is a group of claimants represented by the law firm of Baron & Budd (the "Baron & Budd claimants"). The Objecting Insurers contend that, in settlement of the Baron & Budd claimants' objection to the Plan, the Plan Proponents have agreed that these claimants may forum shop and may assert claims that are time barred.

They note that, to resolve another objection to the Plan, a third group of claimants, represented by David C. Thompson (the "Constructive Trust claimants"), are not being classified at all. Instead, they are being paid directly by USF & G upon confirmation in a higher percentage than other asbestos related claims. Finally, the Objecting Insurers contend that the Plan provision that permits the Trust to reassign asbestos claimants' direct actions back to some individuals, at the Trust's discretion, violates 11 U.S.C. § 1123(a)(4).

The Objecting Insurers argue that, because of their disparate treatment, placing these various groups of claims in the same class violates 11 U.S.C. § 1123(a)(4). According to the Objecting Insurers, if these groups of claims were separately classified, the Plan could not be confirmed. As a separate class, the unliquidated claims would not have accepted the Plan in the requisite number and dollar amount required by 11 U.S.C. § 1129(a)(8) and § 524(g)(2)(B)(ii)(IV).

■ The Plan Proponents have responses for each of these contentions. Taken individually, many of their responses seem persuasive. As noted above, the Court agrees that it is commonplace for liquidated and unliquidated claims to be placed in the same class. It is not necessary to make liquidated claims wait for payment until all disputed and unliquidated claims have been resolved. All that is necessary is to reserve a sufficient amount from any distribution made to liquidated claims so that an equivalent percentage payment

---

**13.** No issue of less favorable treatment is presented by the provisions of section 5.4 of the TWP because all parties affected thereby have consented to their treatment.

**14.** Apparently in recognition of the discrepancy in the amounts of the California default judgments as compared to claims liquidated in other fashions, the holders of the California

default judgment claims have agreed to reduce their claims by 12% for purposes of calculating the initial distribution. They will only receive a distribution based on the full amount of their claims after a specified amount of additional insurance proceeds have been recovered by the Trust: i.e., from the Objecting Insurers.

may be made to any claims liquidated in the future. Section 524(g)(2)(B)(ii)(V) clearly envisions that asbestos claims will be paid periodically as they accrue and as they are allowed. Otherwise, it would be unnecessary for the Court to determine that the Trust procedures reasonably ensure equivalent treatment of present claims and future demands.

The Court finds no merit in the Objecting Insurers' contention that the California default judgment claims are receiving additional compensation in the form of releases from fraudulent transfer actions. The Objecting Insurers apparently contend that the plaintiffs who obtained default judgment submitted false evidence so as to obtain judgments in inflated amounts. They have presented no evidence to support these contentions. The difference between the amounts of these judgments and the amounts of the claims liquidated through the Matrix is not surprising since the latter amounts are based on average settlement amounts.

However, some of the ways in which various groups have been and will be paid do raise concerns about equality of treatment. Moreover, the objections raised by the Objecting Insurers with respect to 11 U.S.C. § 1123(a)(4) are closely tied to the issue of whether the issuance of the third party injunctions is fair and equitable as required by 11 U.S.C. § 524(g)(4)(B)(ii). As discussed below, that issue is being reserved for determination at the confirmation hearing. For that reason, the Court concludes that this issue should be reserved as well.

Finally, the Plan Proponents argue that the Objecting Insurers have no standing to raise this issue. The Court declines to rule on the standing issue at this time. In any event, in order to confirm the Plan,

the Court must find that the Plan complies with 11 U.S.C. § 1129(a)(1) which incorporates 11 U.S.C. § 1123(a)(4). Even if they have no standing to raise this issue, the Objecting Insurers perform a useful function in pointing out to the Court any perceived deficiency in the Plan with respect to these provisions.

### (2) Section 1123(b)(6)

■ As recited above, 11 U.S.C. § 1123(b)(6) permits a plan to contain only provisions that are "appropriate" and are consistent with the applicable provisions of the Bankruptcy Code. The Objecting Insurers contend that the Plan provisions are inappropriate and/or inconsistent with Bankruptcy Code provisions in four respects.

First, the Objecting Insurers contend that allowing the California default judgment claims to be paid is inconsistent with 11 U.S.C. § 541(c). Second, they contend that the TDP denies them their right under bankruptcy law to object to the asbestos claims.[15] Third, they contend that the Plan's request that the Court "adjudicate" the total amount of asbestos related claims against the Debtors is inappropriate and inconsistent with 11 U.S.C. § 524(g)(2)(B)(ii)(II). Fourth, they contend that section 8.4 of the Plan improperly releases claims against the Plan Proponents and their agents. Each of these issues is addressed below.

### (a) Is Allowance of California Default Judgment Claims Inconsistent With 11 U.S.C. § 541(c)(1)(B)?

The Objecting Insurers contend that the Plan violates 11 U.S.C. § 1123(b)(6) by permitting the California default judgment claims to be treated as valid, liquidated claims against the Debtors. They contend that this provision is inconsistent with 11

---

**15.** The Objecting Insurers also contend that the Plan inappropriately modifies its contractual rights under state law. This issue will be discussed in section 4 below.

U.S.C. § 541(c). Section 541(c)(1)(B) provides that:

> ...an interest of the debtor in property becomes property of the estate...notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—
>
> ...
>
> (B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

A provision that effects a termination of rights conditioned on a party's insolvency is sometimes referred to as an *ipso facto* clause.

As noted above, before the coverage litigation with USF & G was settled, the Debtors entered into agreements with certain asbestos claimants, providing that the Debtors would not oppose state court actions on their claims as long as the claimants agreed not to enforce their judgments against the Debtors unless the Debtors filed for bankruptcy. The Objecting Insurers contend that these agreements are inconsistent with 11 U.S.C. § 541(c)(1)(B) because they effect a forfeiture of the Debtors' rights (i.e., not to be liable for these claims) triggered by the Debtors' bankruptcy filing. They contend that, by proposing to treat the judgments obtained pursuant to these agreements as valid, liquidated claims, the Plan violates 11 U.S.C. § 541(c) and thus also violates 11 U.S.C. § 1123(b)(6).

In support of their argument, the Objecting Insurers cite *Matter of Railway Reorganization Estate, Inc.*, 133 B.R. 578 (Bankr.D.Del.1991). In *Railway Reorganization*, the debtor purported to give a creditor a security interest in its property that would spring to life only in the event of a bankruptcy filing. The court held that this provision violated 11 U.S.C. § 541(c)(1)(B) and denied the claim secured status. 133 B.R. at 582–83.

The Plan Proponents argue that *Railway Reorganization* is distinguishable. The Court agrees. Section 541(c)(1)(B) addresses only what property becomes part of a debtor's bankruptcy estate. The creation of a lien on the debtor's property effects a transfer of the debtor's property. *See* 11 U.S.C. § 101(54). Thus, a lien on the debtor's property that becomes effective only upon a bankruptcy filing violates 11 U.S.C. § 541(c)(1)(B). By contrast, an agreement that an unsecured claim against the debtor will be enforceable only in the event of a bankruptcy filing does not affect the amount of the property that enters the debtor's bankruptcy estate. Such an agreement may diminish the pro rata recovery by other unsecured creditors from a liquidation of the debtor's property. However, 11 U.S.C. § 541(c)(1)(B) does not prohibit such an effect.

In an attempt to fit its argument within the language of 11 U.S.C. § 541(c)(1)(B), the Plan Proponents argue that the California default judgment claimants' agreement to forbear from enforcing their judgments except in the event of the Debtors' bankruptcy constitutes property within the meaning of 11 U.S.C. § 541(c)(1)(B). While this argument passes the straight-face test, the Court concludes that it stretches the meaning of "property" too far. The Court views the meaning of "property," as used in 11 U.S.C. § 541(c)(1)(B), as something that may be sold or collected to generate funds to be distributed funds to creditors. The California default judgment claimants' obligation to forbear enforcing their judgments does not qualify as such.

Moreover, it would be contrary to fundamental bankruptcy policy to conclude that such agreements are unenforceable. One of the fundamental policies of bankruptcy law is to provide a ratable distribution to all creditors with like claims. In the absence of bankruptcy, aggressive creditors may exhaust the assets of an insolvent debtor, obtaining full payment of their claims and leaving nothing left for other less diligent creditors. The agreements entered into between the California default judgment claimants and the Debtors, whereby the claimants forbore from exercising their rights to enforce their judgments until bankruptcy promoted that policy. Therefore, this objection will be overruled.

### (b) Are Plan Provisions Affecting Objecting Insurers' Rights Inappropriate?

■ Next, the Objecting Insurers contend that the Plan and the TDP are inconsistent with 11 U.S.C. § 502(a) (and therefore 11 U.S.C. § 1123(b)(6)) because they do not allow the Objecting Insurers to contest the asbestos claims.[16] Section

502(a) provides that "[a] claim..., proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest...objects."[17] The Objecting Insurers are at least arguably parties in interest with respect to the asbestos claims. The Objecting Insurers contend that the Plan improperly cuts off their right under 11 U.S.C. § 502(a) to object to the asbestos claims. The Court disagrees.

In a chapter 11 case, 11 U.S.C. § 502(a) only governs the right of a party in interest to object to a claim until the plan is confirmed. Once a plan is confirmed, the terms of the plan govern who may object to the claim. 11 U.S.C. § 1141(a). Generally, a plan assigns that right and duty either to the reorganized debtor or to the official creditors' committee. In these cases, that duty is assigned to the Trust. There is nothing inconsistent with the Bankruptcy Code in this provision.[18]

### (c) Is Request To Adjudicate Aggregate Amount of Asbestos Claims Inappropriate?

As noted above, the Plan asks the Court to "adjudicate" the aggregate amount of

---

16. The Objecting Insurers also contend that the Plan and the TDP are inappropriate because they deny the Objecting Insurers their contractual rights under state law. This contention is discussed in the last section of this Memorandum. The issue is reserved for the confirmation hearing. Further, the Objecting Insurers contend that section 10.8 of the Plan is inappropriate. In response to the Court's tentative ruling sustaining this objection, the Plan Proponents agreed to amend this provision. Therefore, this issue is withdrawn pending consideration of the form of the amendment.

17. The Plan Proponents contend that a creditor may object to a claim only if the case fiduciary refuses wrongfully to do so. Although they cite some authority for that proposition, the Court finds that authority unpersuasive in the face of the plain language of 11 U.S.C. § 502(a).

18. The issue is complicated by the fact that, at the beginning of these cases, at the Plan Proponents' request, the Court excused the asbestos claimants from filing individual proofs of claim. Instead, they were required to file the equivalent to proofs of claim as part of their ballots. This made it difficult for the Objecting Insurers to object to the asbestos claims on an individual basis before confirmation. As discussed above, they have objected to one group of claims—the California default judgment claims—on legal grounds. However, the Objecting Insurers do not object that they have been deprived of the right to object to the asbestos claims on an individual basis before confirmation of the Plan. They object to being denied that right after confirmation as the claims are being liquidated pursuant to the TDP.

asbestos related claims and demands against the Debtors as part of the confirmation process. In its Tentative Decision, the Court stated its conclusion that it could not "adjudicate" the aggregate amount of asbestos related claims and demands as part of the confirmation process. Based on this tentative ruling, at the hearing, the Plan Proponents agreed to modify the Plan to delete any such request. The Objecting Insurers asked the Court to issue a ruling on this legal issue nonetheless, either as part of the Plan confirmation process or pursuant to its motion for summary judgment filed in its adversary proceeding seeking declaratory relief. The Court declines to do so. Given the Plan Proponents' withdrawal of the request for an adjudication from the Plan, the issue is moot, and any ruling made by the Court would be dicta at best.

### (d) Are Release Provisions Inappropriate?

■ Finally, the Objecting Insurers contend that section 8.4 of the Plan violates 11 U.S.C. § 1123(b)(6). Section 8.4 provides that neither the Plan Proponents nor any of their agents, including their attorneys, shall be liable, other than for willful misconduct, with respect to any action or omission prior to the effective date in connection with the Debtors' operations, the Plan, or the conduct of the bankruptcy case. This provision includes actions and omissions that took place before these bankruptcy cases were filed. The Objecting Insurers contend that this provision is overbroad in three respects: (1) by releasing claims against the Plan Proponents other than the Debtors, (2) by releasing claims against the Plan Proponents' agents, including their attorneys, and (3)

by covering pre-petition actions or omissions.

The Plan Proponents contend that such provisions are entirely proper and need not be limited to the Debtors nor to post-petition acts. In support of this proposition, they rely primarily on *In re PWS Holding Corp.*, 228 F.3d 224, 245 (3rd Cir. 2000). In *PWS Holding*, the court rejected the argument that a plan provision releasing a creditors' committee and its professionals from third party claims, other than for willful misconduct or ultra vires acts, violated 11 U.S.C. § 524(e).[19] The Third Circuit concluded that the release provision gave the committee and its professionals no more protection than they already had under the applicable provisions of the Bankruptcy Code. 228 F.3d at 245–46.

They also cite *In re Drexel Burnham Lambert Group*, 138 B.R. 717, 722 (Bankr. S.D.N.Y.) and *Vasconi & Associates, Inc. v. Credit Manager Association of California*, 1997 WL 383170 (N.D.Cal.1997). In *Drexel Burnham*, a bankruptcy court also upheld a release provision affecting the members of an equity security committee and its counsel, other than for willful misconduct, as merely stating applicable law. It concluded that the committee and its counsel had limited immunity from such claims. Similarly, the *Vasconi* court affirmed the dismissal of an adversary proceeding against the members of a creditors' committee for breach of fiduciary duty and negligence in their implementation of a confirmed plan.

The Objecting Insurers contend that the Ninth Circuit views such provisions with disfavor. They do not discuss *Vasconi*. Instead, they cite *In re WCI Cable, Inc.*, 282 B.R. 457, 477 (Bankr.D.Or.2002).[20]

---

19. Section 524(e) provides that: "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."

20. The other cases cited by the Objecting Insurers are not sufficiently on point to be worth discussing.

However, in *WCI Cable*, the court ultimately approved two release provisions in a chapter 11 plan. As did the courts cited above, it concluded that the provision releasing the creditors' committee (but not its professionals) from liability, other than for willful misconduct and ultra vires acts, merely accurately stated the law. 282 B.R. at 476–77.

With respect to the provision releasing the plan proponents, and their officers, directors, and professionals, while expressing some concerns about this provision, the *WCI Cable* court ultimately approved it provided the release were modified to apply only to post-petition acts. 282 B.R. at 479. Thus, the only issue appears to be whether it is appropriate for the release to apply to pre-petition acts.[21] The Court concludes that the release provisions are overbroad but not to the extent contended by the Objecting Insurers.

Based on the authorities recited above, the Court concludes that the release provisions may include all of the Plan Proponents and their agents, including their professionals, and may apply to pre-petition as well as post-petition acts. It may have made sense in the context of *WCI Cable* to limit the scope of the release to post-petition acts and omissions. However, it does not make sense to do so here. The Plan Proponents and their professionals were clearly engaged in negotiating the settlement upon which the Plan is based and in preparing for the bankruptcy filing in a variety of other ways long before the cases were filed. If they are entitled to a release for their post-petition acts or omissions, they are also entitled to a release for these pre-petition acts or omissions.

However, in the Tentative Decision, the Court noted that the language of section 8.4 is not limited to pre-petition acts or omissions in connection with settlement negotiations or with preparation for filing the bankruptcy cases. It purports to release any claim based on the operation or management of the business regardless of whether that act or omission had anything to do with the bankruptcy case and without any limit as to time. The Court concluded that this type of release was beyond its powers, at least in the Ninth Circuit. *See In re American Hardwoods, Inc.*, 885 F.2d 621, 624–27 (9th Cir.1989) (distinguishing permanent injunction affecting mass tort claims). Thus, it tentatively ruled that section 8.4. should be modified accordingly. In response to this tentative ruling, at the October 29 hearing, the Plan Proponents agreed to modify the language as directed. Assuming the amended language is satisfactory, this objection will be overruled.

#### b. Section 1129(a)(3)

Section 1129(a)(3) requires the Court to find that the Plan has been proposed in good faith and not by any means forbidden by law. The Objecting Insurers contend that the Plan was filed in bad faith. They filed a motion to dismiss these chapter 11 cases on bad faith grounds shortly after they were filed.[22] They argue that these cases have been filed for the benefit of USF & G, not for the Debtors.

---

**21.** The Plan Proponents cite *In re Asbestos Claims Management Corp.*, 294 B.R. 663, 689–90 (N.D.Tex.2003); and *In re Celotex Corp.*, 204 B.R. 586, 626–27 (Bankr.M.D.Fla.1996), which recite release provisions covering pre-petition as well as post-petition acts contained in confirmed chapter 11 plans. However, those cases contain no discussion regarding the propriety of such provisions.

**22.** The Court denied the motion without prejudice to its being reasserted at confirmation.

According to the Objecting Insurers, the Debtors did not need to file for bankruptcy because they had agreements with most of the asbestos claimants not to enforce their claims against the Debtors except in the event of a bankruptcy filing. As evidence that the Debtors had no need of bankruptcy relief themselves, the Objecting Insurers note that USF & G is paying all the Debtors' expenses in the bankruptcy proceeding. The Debtors originally proposed to contribute nothing to the Trust. In response to the Court's ruling that such a plan did not even comply technically with 11 U.S.C. § 524(g), the Plan Proponents modified the Plan to provide that the Debtors would contribute a promissory note payable over five years in the face amount of $500,000 plus all but $1.0 million of their bad faith business loss claims against the Objecting Insurers. The Objecting Insurers contend that these contributions are still inadequate.

Moreover, the Objecting Insurers contend that the Plan Proponents have acted in bad faith in prosecuting the case and in their conduct before the case was filed. They note that USF & G agreed to pay the asbestos claimants' attorneys $12.3 million prior to the bankruptcy filing to persuade their clients to agree to the settlement with USF & G. They contend that, after the bankruptcy cases were filed, the Plan Proponents bought off several groups of objecting creditors by agreeing to give them preferential treatment under the Plan or, in the case of the Constructive Trust claimants, outside the Plan. They contend that the unequal treatment of certain groups of claimants in Class 4 and the payments to their attorneys presents constitutional grounds for denying confirmation. Finally, the Objecting Insurers also contend that the Plan was filed in bad faith as an attempt by the Plan Proponents to obtain a tactical advantage in the insurance coverage litigation against the Objecting Insurers in state court.

The Plan Proponents dispute these contentions on factual and/or legal grounds. They contend that the issue of good faith should be reserved for the confirmation hearing. For the most part, the Court agrees. However, the Court will overrule as a matter of law the Objecting Insurers' contention that the settlements with the various groups of claimants who had objected to the Plan were in bad faith. The Court would not have approved the settlements if it had believed they were being proposed in bad faith. As discussed above, the issue of whether the proposed treatment of the various groups pursuant to the settlements is preferential and therefore bars confirmation based on 11 U.S.C. § 1123(a)(4) will be reserved for confirmation.

### c. Section 1129(a)(4)

Section 1129(a)(4) requires the Court to find that any payment made or to be made by the Plan Proponents for costs or services in connection with the bankruptcy cases or the Plan has been approved or is subject to approval by the court as reasonable. In their bullet point objections, the Objecting Insurers contended that the Plan does not satisfy 11 U.S.C. § 1129(a)(4). They did not discuss this objection in their briefs. The Plan Proponents note that the Plan requires the Court to approve the fees and costs paid and to be paid to the professionals whose employment was approved by the Court. They note that the Court need not approve the fees and costs paid and to be paid to the professionals for USF & G because USF & G is not a Plan Proponent.

However, as the Objecting Insurers note in another context, prior to the petition date, USF & G paid $12.3 million to certain claimants' attorneys as agreed during final settlement negotiations. The Plan does not require the Court to approve

these payments as reasonable. In the Tentative Decision, the Court tentatively ruled that the Plan's failure to do so violated 11 U.S.C. § 1129(a)(4) and barred confirmation. At the October 29 hearing, the Plan Proponents stated that they would amend the Plan to submit these payments to the Court for approval as reasonable. As a result, assuming the Plan is modified in this fashion, the issue will be resolved.[23]

### d. Section 1129(a)(7)

Section 1129(a)(7) requires the Court to find that any member of an impaired class who voted against the Plan will receive at least as much through the Plan as he or she would receive if the Debtors were liquidated in a chapter 7 case. The Plan Proponents acknowledge that two members of Class 4, the only impaired class of claims, voted against the Plan.[24] They concede that, as to Class 4, evidence will have to be presented. As noted above, in this context, the Court may be required to determine the legal issue of whether a future demand qualifies as a claim for purposes of the best interest test. A decision on this legal issue as well as the factual question presented by this requirement will be deferred until the confirmation hearing.

### 2. SECTION 524(g) REQUIREMENTS

■ The effectiveness of the Plan depends on the Court's ability to issue an injunction in conjunction with confirmation of the Plan, preventing the asbestos claims from being asserted against USF & G, among others. This injunction may be issued only if the Plan and the Trust satisfy the requirements set forth in 11 U.S.C. § 524(g)(2)(B) and § 524(g)(4)(B).

Section 524(g)(2)(B)(i) requires the Plan to provide for a Trust that:

(I) is to assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

(II) is to be funded in whole or in part by the securities of 1 or more debtor involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends;

(III) is to own, or by the exercise of rights granted under such plan would be entitled to own if specified contingencies occur, a majority of the voting shares of—

(aa) each such debtor—

(bb) the parent corporation of each such debtor; or

(cc) a subsidiary of each such debtor that is also a debtor; and

23. The amendment will not prevent the Objecting Insurers from arguing that this payment invalidated the votes of the clients of the counsel who received it or is evidence that the Plan is not being proposed in good faith.

24. Section 1129(a)(7) requires the Court to make the same finding as to any impaired class of interests. Classes 5B (the equity holders of Western Asbestos, the dissolved corporation) and Class 5C (the equity holders of the MacArthur) are both impaired. However, all of the members of Class 5C voted for the Plan. Because all the shares of Class 5B will be transferred to the Trust, the members of this class are deemed to have rejected the Plan, and their votes are not solicited. 11 U.S.C. § 1126(g). The Plan must and can be confirmed over their deemed rejection pursuant to 11 U.S.C. § 1129(b)(2)(C)(ii) because no junior class of interests will receive or retain anything under the Plan. Because the members of this class are not entitled to vote, the Court concludes that 11 U.S.C. § 1129(a)(7) does not apply to them.

(IV) is to use its assets or income to pay claims and demands....

Section 524(g)(2)(B)(ii) requires the Court to determine that:

(I) the debtor is likely to be subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the claims that are addressed by the injunction;

(II) the actual amounts, numbers, and timing of such future demands cannot be determined;

(III) pursuit of such demands outside the procedures prescribed by such plan is likely to threaten the plan's purpose to deal equitably with claims and future demands;

(IV) as part of the process of seeking confirmation of such plan-

(aa) the terms of the injunction proposed to be issued under paragraph (1)(A), including any provisions barring actions against third parties pursuant to paragraph (4)(A), are set out in such plan and in any disclosure statement supporting the plan; and

(bb) a separate class or classes of the claimants whose claims are to be addressed by a trust described in clause (I) is established and votes, by at least 75 percent of those voting, in favor of the plan; and

(V) ...pursuant to court orders or otherwise, the trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of present claims and future demands, or other comparable mecha-

nisms, that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner.

Section 524(g)(4)(B) provides that an injunction will protect third parties from future asbestos related demands only if:

(i) as part of the proceedings leading to issuance of such injunction, the court appoints a legal representative for the purpose of protecting the rights of persons that might subsequently assert demands of such kind; and

(ii) the court determines, before entering the order confirming such plan, that identifying such debtor or debtors, or such third party...in such injunction with respect to such demands for purposes of this subparagraph is fair and equitable with respect to the persons that might subsequently assert such demands, in light of the benefits provided, or to be provided, to such trust on behalf of such debtor or debtors or such third party.

The Objecting Insurers do not contend that the Plan violates 11 U.S.C. § 524(g)(2)(B)(i)(I) or (IV), 11 U.S.C. § 524(g)(2)(B)(ii)(I)-(IV), or 11 U.S.C. § 524(g)(4)(B)(i). The Court concludes that the Plan complies with these subsections. The Plan Proponents concede that whether the Plan complies with 11 U.S.C. § 524(g)(4)(B)(ii) and § 524(g)(2)(B)(ii)(V) present disputed factual issues that must be reserved for the confirmation hearing.[25] Thus, the Court will only discuss below the issues raised by 11 U.S.C. § 524(g)(2)(B)(i)(II) and (III).

---

**25.** The Plan Proponents ask the Court to rule as a matter of law at this time that "fair and equitable" as used in 11 U.S.C. § 524(g)(4)(B)(ii) does not have the same meaning as in 11 U.S.C. § 1129(b). The Court agrees that it does not and will so hold at this time.

### a. Section 524(g)(2)(B)(i)(II)

As recited above, 11 U.S.C. § 524(g)(2)(B)(i)(II) requires the Trust to be funded in whole or in part by the securities of one or more debtor involved in the Plan and by the obligation of such debtor or debtors to make future payments, including dividends. The Objecting Insurers contend that the Plan does not comply with this requirement.

The Plan provides that Western Asbestos will contribute all of its stock to the Trust. However, it does not obligate Western Asbestos to make any future payments to the Trust. In any event, since Western Asbestos is defunct, it is in no position to make future payments to the Trust. Therefore, this provision does not satisfy 11 U.S.C. § 524(g)(2)(B)(i)(II).

However, the Plan also provides that MacArthur will contribute to the Trust a promissory note for $500,000, payable over five years. The Plan Proponents note that the definition of a "security" in 11 U.S.C. § 101(49) expressly includes a note. The Plan also requires MacArthur to make payments to the Trust pursuant to the note. The Court concludes that these provisions are sufficient to satisfy 11 U.S.C. § 524(g)(2)(B)(i)(II).[26]

The Objecting Insurers contend that the Plan does not satisfy 11 U.S.C. § 524(g)(2)(B)(i)(II) because it does not require any of the Debtors to pay *dividends* to the Trust. The Objecting Insurers read 11 U.S.C. § 524(g)(2)(B)(i)(II) as *requiring* payment in this form. The Plan Proponents read the statute to permit, but not to require, the future payments to be in the form of dividends.

The Court agrees with the Plan Proponents' reading of the statute. The construction of 11 U.S.C. § 524(g)(2)(B)(i)(II) suggested by the Objecting Insurers makes no sense. If a chapter 11 debtor can satisfy its obligation to fund the Trust with a security by funding the Trust with a note, it makes no sense to read 11 U.S.C. § 524(g)(2)(B)(i)(II) as requiring the payment to be in the form of a dividend. If that had been Congress' intention, the debtor would have been obligated to fund the Trust with stock.

### b. Section 524(g)(2)(B)(i)(III)

As recited above, 11 U.S.C. § 524(g)(2)(B)(i)(III) requires the Plan to provide that the Trust will own or be entitled to own, upon the happening of specified contingencies, a majority of the voting shares of each debtor, the parent of each debtor, or the subsidiary of each debtor. The Plan satisfies this requirement. As noted in the preceding section, the Plan provides that Western Asbestos will contribute all of its shares to the Trust. It does not provide for any share contribution by Western MacArthur. However, it does provide that, upon the happening of a specified contingency, the Trust will own 51% of the voting shares of MacArthur. Since MacArthur is the parent of Western MacArthur, this provision satisfies 11 U.S.C. § 524(g)(2)(B)(i)(III) as to both MacArthur and Western MacArthur. The Objecting Insurers contend that these provisions do not satisfy 11 U.S.C. § 524(g)(2)(B)(i)(III). First, they

---

**26.** The Plan also requires the Debtors to contribute to the Trust two additional items which the Plan Proponents allege are also securities: i.e., the MacArthur Business Loss Insurance Security and the MacArthur General Insurance Security. The Plan assigns to the Trust any payments that are recovered from these two sources. Since the Court concludes that the promissory note and the payments pursuant to it satisfy the requirements of 11 U.S.C. § 524(g)(2)(B)(i)(II), the Court need not decide whether these alternate sources of funding for the Trust satisfy the statute.

note that Western Asbestos is a defunct corporation with no assets. As a result, its shares have no value. Second, they note that the contingency that would trigger the Trust's ownership of 51% of the voting stock of MacArthur—the nonpayment of $500,000 as evidenced by the promissory note—is insubstantial in relation to the total amount of the asbestos claims. Moreover, they note that the Plan gives MacArthur the right to recoup this $500,000 payment, and more, from future recoveries from the Objecting Insurers.

The Objecting Insurers contend that the purpose of 11 U.S.C. § 524(g)(2)(B)(i)(II) and (III) is to give the Trust a stake in the success of the future operations of the debtors as a quid pro quo for their discharge and that these provisions fails to meet that purpose.[27] They note that the Court previously rejected as not conforming to the statute the contingency proposed in the original version of the Plan.[28]

The Plan Proponents respond that, as enacted, 11 U.S.C. § 524(g)(2)(B)(i)(III) does not require the Plan to give the Trust and the asbestos claimants a stake in the success of the Debtors' future operations. They contend that the more fundamental purpose of 11 U.S.C. § 524(g)(2)(B)(i)(II) and (III) is to provide for substantial payments to the asbestos claimants. Where the Trust is to be funded at the onset by a substantial contribution from one of the Debtors' insurers and where, by compari-

son, the Debtors' liquidation value is nominal, the contingency need not require the Debtor to make substantial future contributions in order to retain control over its operations.

The Plan Proponents also note that the vast majority of holders of asbestos related claims have voted in favor of the Plan. They question whether, as an equitable matter, the Objecting Insurers have standing to raise this objection on the asbestos claimants' behalf.

The Court concludes that the Plan satisfies 11 U.S.C. § 524(g)(2)(B)(i)(III). Unlike the "contingency" proposed in the original version of the Plan, the contingency proposed here is clearly of the nature intended by the statute. The Objecting Insurers object only to its amount. The Court believes that this objection should be considered at the confirmation hearing in the context of 11 U.S.C. § 524(g)(4)(B)(ii) rather in the context of this subsection.

## 3. THE INJUNCTIONS

As part of the confirmation process, in order for the Plan to be effective, two injunctions must be issued: (1) a discharge injunction and (2) a 11 U.S.C. § 524(g) injunction (the "supplemental injunction").[29] The Plan Proponents ask the court to determine as a matter of law certain issues related to these injunctions.

---

**27.** The Objecting Insurers note that 11 U.S.C. § 524(g) was enacted to codify and ratify the plans confirmed in the seminal asbestos claim chapter 11 cases: *Johns–Manville* and *UNR.* In *Johns–Manville,* the trust established to pay the asbestos related claims was funded with 80% of the debtor's stock and 20% of its future profits. In *UNR,* the trust was funded with 63% of the debtor's stock and the right to receive substantial future dividends.

**28.** The Plan, as originally filed, proposed that the Trust could own MacArthur's shares by

purchasing them at their fair market value. The Court found that this contingency did not satisfy 11 U.S.C. § 524(g)(2)(B)(i)(III).

**29.** The Plan Proponents contend that 11 U.S.C. § 524(g) provides for the issuance of three types of injunctions: (1) a channeling injunction, (2) a supplemental injunction, and (3) an asbestos insurance injunction. The Court reads 11 U.S.C. § 524(g) as providing for only one type of injunction, albeit with a variety of effects.

Each of these injunctions and the issues related to them are discussed below.

### a. The Discharge Injunction.

 A corporate chapter 11 debtor receives a discharge from all pre-petition debts unless the plan provides for the liquidation of all or substantially all of the property of the debtor's bankruptcy estate and the debtor does not intend to engage in business after consummation of the plan. 11 U.S.C. § 1141(d)(3). If a chapter 11 debtor receives a discharge, the confirmation order gives rise to an injunction enjoining the prosecution of the discharged debts against the debtor. 11 U.S.C. § 524(a).

The Objecting Insurers do not dispute that, if the Plan is confirmed, MacArthur and Western MacArthur will receive a discharge and thus be protected by a discharge injunction. However, they contend that Western Asbestos is not entitled to a discharge and therefore not entitled to the protection of a discharge injunction. They contend that Western Asbestos has no assets and will not operate a business after confirmation.

The Plan Proponents disagree. They contend that Western Asbestos has sufficient assets and business activity to entitle it to a discharge and thus the protection of a discharge injunction. It has directors and officers, assets (its rights under the Policies), and liabilities (the asbestos claims). After confirmation, its business activity will be to assign the Policies to the Trust, if possible, and, if not, to pursue its rights under the Policies itself and ultimately to wind up its affairs.

The Court concludes that Western Asbestos is not entitled to a discharge or to the protection of a discharge injunction. It agrees with the Plan Proponents that a dissolved corporation is entitled to be a chapter 11 debtor. The Plan Proponents have cited three cases so holding: *In re Cedar Tide Corp.*, 859 F.2d 1127, 1132–33 (2nd Cir.1988); *In re Martin–Trigona*, 760 F.2d 1334 (2nd Cir.1985); *In re Quad City Minority Broadcasters, Inc.*, 252 B.R. 773 (Bankr.S.D.Iowa 2000). In all three cases, the courts concluded that a dissolved corporation was qualified to be a debtor in a bankruptcy case. They based this conclusion in part on state law permitting a dissolved corporation to sue and be sued. California law contains such a provision. *See* Cal. Corp.Code § 2010 [30]; *Penasquitos, Inc. v. Superior Court*, 53 Cal.3d 1180, 283 Cal.Rptr. 135, 812 P.2d 154 (1991). Accordingly, the Court reaches the same conclusion as the three courts cited above.

However, the Court disagrees with the Plan Proponents' further contention that Western Asbestos qualifies for a discharge under 11 U.S.C. § 1141(d)(3). There would be no substance left to 11 U.S.C. § 1141(d)(3) if the level of assets and business activity retained by Western Asbestos entitled it to a discharge. Therefore, the Court determines as a matter of law that Western Asbestos is not entitled to a discharge or to the protection of a discharge injunction.

### b. The Supplemental Injunction.

 The Plan Proponents contend that, even if Western Asbestos is not enti-

**30.** Section 2010(a) of the California Corporations Code provides that "[a] corporation which is dissolved nevertheless continues to exist for the purpose of winding up its affairs, prosecuting and defending actions by or against it and enabling it to collect and discharge obligations, dispose of and convey its property and collect and divide its assets, but not for the purpose of continuing business except so far as necessary for the winding up thereof." The aims being pursued by Western Asbestos in the Plan are consistent with the activities permitted by this provision.

tled to the protection of a discharge injunction, it is entitled to the protection of the supplemental injunction provided by 11 U.S.C. § 524(g). The Objecting Insurers dispute this contention. They note that 11 U.S.C. § 524(g) provides for the issuance of an injunction to "supplement" the discharge injunction. *See* 11 U.S.C. § 524(g)(1)(A).[31] Because Western Asbestos is not entitled to a discharge injunction, according to the Objecting Insurers, there is nothing to supplement.

Again, the Plan Proponents contend that the Objecting Insurers have no standing to raise this objection. As stated earlier, the Court will not reach this issue. Whether or not the Objecting Insurers have standing, the Court will consider their objections since it must conclude that such an injunction is authorized by 11 U.S.C. § 524(g) in order to issue it.

■ The Court agrees with the Objecting Insurers that Western Asbestos is not entitled to the protection of the supplemental injunction but for a different reason. The Court does not believe that an entity must receive a discharge to be entitled to the protection of the supplemental injunction. All that is necessary is that some debtor receive a discharge. Section 524(g)(1)(B) specifies the entities who are entitled to the protection of a supplemental injunction. *See* 11 U.S.C. § 524(g)(1)(B).[32] None of the parties described there is entitled to a discharge.

The question remains whether Western Asbestos qualifies as one of the parties specified by 11 U.S.C. § 524(g)(1)(B)(ii)(I)-(IV) as entitled to the protection of the supplemental injunction. Section 524(g)(4)(A)(ii) provides as follows:

(ii) Notwithstanding the provisions of section 524(e), such an injunction may bar any action directed against a third party who is identifiable from the terms of such injunction...and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such third party arises by reason of—

(I) the third party's ownership of a financial interest in the debtor or a past or present affiliate or predecessor in interest of the debtor;

(II) the third party's involvement in the management of the debtor, or a predecessor in interest of the debtor, or the third party's service as an officer, director or employee of the debtor or of a related party;

(III) the third party's provision of insurance to the debtor or to a related party; or

(IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition of the debtor or of a related party, including but not limited to—

---

**31.** Section 524(g)(1)(A) provides that: "After notice and hearing, a court that enters an order confirming a plan of reorganization under chapter 11 may issue, in connection with such order, an injunction in accordance with this subsection *to supplement the injunctive effect of a discharge* under this section. [Emphasis added.]"

**32.** Section 524(g)(1)(B) provides that: "An injunction may be issued...to enjoin entities

from taking legal action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any claim or demand that, under a plan of reorganization, is to be paid in whole or in part by a trust described in paragraph (2)(B)(I), except such legal actions as are expressly allowed by the injunction, the confirmation order, or the plan of reorganization."

(aa) involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction; or

(bb) acquiring or selling a financial interest in an entity as part of such a transaction.

The Plan Proponents contend that Western Asbestos qualifies as a party that may be protected by the supplemental injunction pursuant to 11 U.S.C. § 524(g)(4)(A)(ii)(IV). They note that Western Asbestos is alleged to be liable for the claims that are also claims against the other two Debtors. Moreover, Western Asbestos was involved in a financial transaction affecting the financial condition of Western MacArthur: i.e., Western MacArthur's purchase of Western Asbestos's assets.

This contention ignores an important part of 11 U.S.C. § 524(g)(4)(A)(ii)(IV): i.e., "to the extent such alleged liability of such third party arises by reason of. . . ." Section 524(g)(4)(A)(ii)(IV) requires that *Western Asbestos's liability* for claims that are also claims against Western Asbestos arise as a result of the financial transaction affecting the financial condition of Western MacArthur. However, Western Asbestos's liability for the asbestos claims arises as a result of its own financial operations, not as a result of the asset purchase. Western MacArthur could claim the benefit of 11 U.S.C. § 524(g)(4)(A)(ii)(IV) if it needed to do so. Western Asbestos cannot.

Ironically, 11 U.S.C. § 524(g)(4)(ii)(I) and (II) would permit an owner or manager of Western Asbestos to be protected by a supplemental injunction. The Court concludes that the omission of the predecessor itself in these subsections was a drafting oversight. The Plan Proponents contend

that, even if 11 U.S.C. § 524(g) does not authorize a supplemental injunction protecting Western Asbestos, the Court may and should issue such an injunction under 11 U.S.C. § 105. The Court agrees provided the Plan Proponents establish that such an injunction is necessary to the effectiveness of the Plan.[33] This has not yet been established to the Court's satisfaction. The nature of the harm threatened by the lack of such an injunction has not been made sufficiently clear.

The Court is mindful of the limits of its authority under 11 U.S.C. § 105. *See In re Lowenschuss,* 67 F.3d 1394, 1402 (9th Cir.1995); *In re Yadidi,* 274 B.R. 843, 848 (9th Cir. BAP 2002)("§ 105 is not a roving commission to do equity or to do anything inconsistent with the Bankruptcy Code.") However, the Court does not believe that issuing such an injunction, if necessary, would exceed that authority. To the contrary, the Court believes that 11 U.S.C. § 105 exists for just such a situation.

In their reply brief, the Objecting Insurers contend that, even if 11 U.S.C. § 524(g) authorizes the issuance of a supplemental injunction enjoining their assertion of contribution claims, the Court should refuse to grant such an injunction as an equitable matter. The Court disagrees.

While an injunction is an equitable remedy, in this instance, the equities are built into 11 U.S.C. § 524(g). If those equities are satisfied, the Court does not believe that it has the discretion to limit the effect of the supplemental injunction to something less than that permitted by statute. However, as noted above, 11 U.S.C. § 1129(a)(3) requires the Court to find that the Plan was proposed in good faith. If the Objecting Insurers are able to con-

---

**33.** Section 105(a) empowers the Court to issue: "any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

vince the Court that the Plan is inequitable in its effect on them, presumably, the Court will be unable to find that the Plan satisfies this provision and will decline to confirm the Plan.

In a footnote, the Objecting Insurers also question whether a supplemental injunction has the effect of enjoining the assertion of these contribution claims against USF & G. Although this issue presents a closer question, again, the Court disagrees with the Objecting Insurers. The express language of 11 U.S.C. § 524(g)(1)(B) is not helpful in resolving the issue. As the Objecting Insurers point out, they will not be receiving payments from the Trust. Therefore, the language permitting the enjoining of any claim or demand that "is to be paid in whole or in part by a trust" does not appear to permit the enjoining of contribution claims.

■■■ Nevertheless, the Court concludes that the supplemental injunction may enjoin the Objecting Insurers' contribution claims. The strongest argument for this conclusion is that, for the supplemental injunction to be effective, it must bar contribution claims. While that argument does not justify the Court's reading 11 U.S.C. § 524(g)(1)(B) in a manner to which its language is not susceptible, it does and should inform the Court's reading of that subsection.

The textual basis for the Court's conclusion is the language providing that the injunction may "enjoin entities from taking legal action for the purpose of directly *or indirectly* collecting...any claim that...is to be paid in whole or in part by a trust...." The Objecting Insurers' asser-

tion of contribution claims against USF & G would clearly constitute indirect attempts to collect the asbestos claims. Therefore, the Objecting Insurers may be enjoined from asserting their contribution claims.

## 4. INSURANCE ISSUES

■■■ The Plan provides that the Debtors will transfer their rights under the Policies to the Trust. The Objecting Insurers contend that, by transferring the Policies to the Trust, the Plan improperly modifies their contractual rights under state law. They note that the Policies state that they may not be assigned without the Objecting Insurers' consent. At the hearing, the Objecting Insurers conceded that the transfer of the Policies to the Trust, by itself, does not violate this provision and is authorized by 11 U.S.C. § 1123(a)(5).[34] However, they contended that the way in which the Plan operates, pursuant to the TDP and the Matrix, denies them their contractual rights under state law. They contend that a chapter 11 plan may not affect an insurer's contractual rights under state law.

In particular, the Objecting Insurers note that, under state law, an insured is required to tender the defense of any claim that the insured alleges is covered by an insurance policy to the insurer. Unless the insurer declines to accept the tender of the defense, with or without a reservation of rights, the insurer is entitled to participate in the defense of the action and in any settlement of the claim. If the insurer is not allowed to do so, the insurer is not liable to pay the claim even if the

---

**34.** Section 1123(a)(5) provides as follows:
Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—

...

(5) provide adequate means for the plan's implementation, such as

...

(B) transfer of all or any part of property of the estate to one or more entities, whether organized before or after the confirmation of such plan.

claim is determined to be covered by the policy. The Objecting Insurers note that the Plan, the Matrix, and the TDP do not propose to require that claims be tendered to them or that they be given a chance to defend against the claims or to participate in any settlement.

The Plan Proponents agree with the Objecting Insurers that the Plan, the Matrix, and the TDP will modify the Objecting Insurers' contractual rights under state law, including in the fashion described in the preceding paragraph. However, they contend that the Bankruptcy Code permits them to do so. They assert that 11 U.S.C. § 524(g) preempts state law governing an insurer's contractual rights under these circumstances. They contend that the Plan is unworkable unless it preempts state law in these respects. They argue that the Court must rule on the preemption issue in order to determine whether the Plan is feasible.

By contrast, the Objecting Insurers contend that this Court may not determine the preemption issue, at least in the absence of an adversary proceeding seeking declaratory relief. They claim that the effect of the Plan on the Objecting Insurers' rights under state law should be left to the state court handling the coverage litigation.

Given the importance and complexity of this issue, the Court will defer its decision on both the preemption issue and the threshold issue of whether it may and should determine the preemption issue until confirmation.

## SUMMARY OF RULINGS AND RESERVED ISSUES

### A. Section 1129 Issues

1. The Plan satisfies 11 U.S.C. § 1129(a)(1) except that:

a. To the extent that 11 U.S.C. § 1129(a)(1) incorporates 11 U.S.C. § 1123(a)(4), whether the Plan satisfies that subsection is reserved for the confirmation hearing.

b. To the extent that 11 U.S.C. § 1129(a)(1) incorporates 11 U.S.C. § 1123(b)(6):

(1) The Plan provision allowing the California default judgment claims is not inconsistent with 11 U.S.C. § 541(c)(1)(B) and does not violate U.S.C. § 1123(b)(6). The Objecting Insurers' objection to the California default judgment claims on this ground is overruled.

(2) The Plan does not improperly modify the Objecting Insurers' rights under bankruptcy law by denying the Objecting Insurers the right to object to the asbestos claims after confirmation.

(3) The release provision included in the Plan are inappropriate only in one respect which the Plan Proponents have agreed to modify. Assuming the modification is satisfactory, this objection will be withdrawn.

2. The Plan satisfies 11 U.S.C. § 1129(a)(2) as a matter of law.

3. The issue of whether the requirements of 11 U.S.C. § 1129(a)(3) can be satisfied is reserved for the confirmation hearing except that the contention that the settlements with the Baron & Budd claimants and the Constructive Trust claimants were proposed in bad faith is overruled as a matter of law.

4. Given the Plan Proponents' agreement to modify the Plan to submit the $12.3 million pre-petition payment by USF & G to certain of the Plan Proponents' counsel to Court approval as reasonable, assuming the modification is satisfactory to the Court, the Plan will satisfy 11 U.S.C. § 1129(a)(4) as a matter of law.

5. The Plan satisfies 11 U.S.C. § 1129(a)(5) and (6) as a matter of law.

6. The issue of whether the Plan satisfies 11 U.S.C. § 1129(a)(7) is reserved for the confirmation hearing.

7. The Plan satisfies 11 U.S.C. § 1129(a)(8)-(13) as a matter of law except to the extent that the violation of other subsections results in a violation of 11 U.S.C. § 1129(a)(8). The latter issue is reserved for the confirmation hearing.

## B. Section 524(g) Issues

1. The Plan satisfies 11 U.S.C. § 524(g)(2)(B)(i)(I)-(IV), 11 U.S.C. § 524(g)(B)(2)(ii)(I)-(IV), and 11 U.S.C. § 524(g)(4)(B)(i) as a matter of law.

2. The following issues are reserved for the confirmation hearing:

a. Whether the Plan satisfies 11 U.S.C. § 524(g)(2)(B)(ii)(V); and

b. Whether the Plan satisfies 11 U.S.C. § 524(g)(4)(B)(ii).

## C. Injunction Issues

If the Plan is confirmed, Western MacArthur and MacArthur are entitled to a discharge and thus the protection of a discharge under 11 U.S.C. § 524(a). USF & G, the Committee, and their agents are entitled to the protection of a supplemental injunction under 11 U.S.C. § 524(g)(4)(A)(ii). Western Asbestos is not entitled to a discharge or a discharge injunction or to a supplemental injunction. However, the Court has the power to issue an injunction protecting Western Asbestos from any prosecution of the asbestos claims under 11 U.S.C. § 105 if the Plan Proponents establish that such an injunction is necessary to the effectiveness of the Plan. This issue is reserved for the confirmation hearing.

The Objecting Insurers may be enjoined from asserting their contribution claims against USF & G, as well as any other parties covered by the supplemental injunction, pursuant to 11 U.S.C. § 524(g)(1)(B) provided the statutory requirements for the issuance of such an injunction are satisfied. Section 524(g)(1)(B) can only sensibly be read to permit the enjoining of such claims. Any inequity in the operation of such an injunction will be considered in determining whether the Plan is being proposed in good faith and whether the requirements under 11 U.S.C. § 524(g) for issuing an injunction are satisfied.

## D. Insurance Issues

The Court concludes that the Policies or rights under the Policies may be transferred to the Trust by virtue of 11 U.S.C. § 1123(a)(5) regardless of whether state law would permit them to be assigned. The Court will reserve for the confirmation hearing all other insurance issues, including whether 11 U.S.C. § 524(g) preempts state law governing the Objecting Insurers' contractual rights and, as a threshold matter, whether this Court (or the state court determining coverage) should rule on this issue.

Counsel for the Plan Proponents are directed to submit a proposed form of order in accordance with this decision after consulting as to the form with opposing counsel.